Good morning. Before we get started with just two oral arguments we have listed for today, I first note on this panel the presence of Judge Ann Thompson from the District of New Jersey. And far beyond just noting that, I want to express on behalf not only of the panel but the entire court our great, great thanks to you Ann for joining us and for helping us with what seems to be an ever increasing workload with an ever smaller number or contingent of judges to deal with that workload. Judge Thompson is a longtime friend of both Judge Cowan's and of mine. I'm this morning outnumbered by the New Jerseyans, but Ann and I knew, Judge Thompson and I knew each other and have known each other for many years and for years as Chief Judges together on the District Court and she's a dear friend and I'm delighted to have the opportunity to sit with her. So Ann, thank you very much. We'll call the first case for this morning, Massaquoi v. Attorney General. Benjamin D. Yerger May it please the Court, my name is Benjamin D. Yerger. I represent Ty Massaquoi, the petitioner in this case. I would like to reserve three minutes for rebuttal. The petitioner in this case was granted asylum by an immigration judge who found he had a well-founded fear of future persecution on account of his membership in a particular social group consisting of severe and obviously mentally ill Liberians. The Board of Immigration Appeals overturned this decision. It did so without ever articulating a standard of review, without finding any specific errors in the immigration judge's findings of fact. By applying a heightened burden of proof, it erroneously imported from Board Convention Against Tortured Jurisprudence and failed to follow its own regulations with respect to initial findings of fact. On the burden of proof, is that actually what occurred here? Was that a technical matter which really didn't influence the decision of the BIA? Are you referring to the citation to JFF, Your Honor? Yeah, yeah. Well, I would say... I cited it for the wrong thing, in effect. Well, I don't know that you can say one way or another if it was a technical matter. The reality is they cited to a case that has no bearing on an asylum grant. JFF is a CAT case where the Attorney General overturned a grant of CAT. Well, we know what it says. Okay. We've looked at JFF. Right. But what is the context in which the BIA invoked JFF? Did they reference it or cite it for purposes of burden of proof? They didn't, did they? Well, what they cited to was for the idea that they cited to it and directly afterwards found that in this case, the asylum applicants, the judge's findings were too speculative. Well, that's what they actually decided the case on, partially, in any event. Is that correct? That's correct. But the problem, Your Honor, is that there's no way to tell from the board's decision how they actually applied JFF. They cited to it and then they said sort of boldly, baldly, without analysis, that this case was too speculative. So there's really no way to tell from their decision how much sort of the heightened burden of proof in a CAT case led into their analysis in this asylum case.  And given the fact that the IJ considered JFF in denying CAT below, he was aware the case said, he said, for the asylum grant, I find a well-founded fear. In the CAT case, applying JFF in the CAT application, excuse me, he said, look, you haven't met your burden of proof here under JFF. Didn't the BIA cite to JFF stating that the case found that deferral of removal cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish that each step in the hypothetical chain of events is more likely than not to happen? That's exactly what they said it to. All right. How does that help you? Well, it helps me. It's the stringing together a series of suppositions that's what the BIA's ultimate disposition here is all about. Right. They found conjecture. They found that the expert testimony was speculative. Well, right. But the question is sort of what standard did they apply in finding that it was too speculative? All the applicants for asylum is required. Excuse me. Go ahead. Does it matter? If it's too speculative, does it even matter? Certainly it does. JFF stands for the proposition that you have to meet your burden of proof more likely than not in each link in a chain of causation leading to torture. In an asylum case, you don't have that burden. All you have to prove is a well-founded fear. Someone in this applicant's position, a reasonable person in this applicant's position, would feel being persecuted given this set of circumstances. Well, if we're both on the same page, namely that JFF deals with speculative decision making, and in effect the court was saying, the BIA was saying that to some extent each link in the chain that the petitioner is positing is not supported by substantial evidence. I mean, that's what they said. I'm not saying I agree or disagree with that, but that was their position. Well, I think that's one way of reading it. The point is you can't tell sort of what they were thinking by their decision. One position you could take is the one that you just articulated. Certainly you could say that. Another position is the one I'm articulating, which is that by inciting JFF, the analysis of a heightened burden of proof led into their decision. But they don't apply any analysis in this case. What they do is they cite to it, they say it's speculative. They don't give the applicant, they don't give this court any basis for that decision. Okay. I think we understand the grasp of that issue of JFF. Why don't you proceed to the next? Okay. You're on. So the other, well, initially, let me clarify something just for the court. Initially, the petitioner also argued that the board had improperly applied a de novo review. I'm very interested in that. Your position in your briefing position was that it made findings of facts, which, of course, we all understand the BIA is not permitted to do. Would you just elucidate us on that? Well, right. So the one issue is whether or not they found facts in violation of the regulations, and specifically HCFR 1003.D3, which clearly said they can't find facts other than sort of common. What facts did they find that weren't found by the IJ? Well, what they did is the issue of whether or not the government of Liberia is willing and able to protect the applicant. As it stands right now, no court has made a factual determination on that issue. The immigration judge in Granning Asylum didn't specifically make a ruling on that issue. But wasn't the issue dealt with in terms of finding that in this country, they're so short of money that they don't deal with people that are mentally ill because they don't have basic medical care. Therefore, it's not a matter that they're persecuting people that are mentally ill. They just don't have the money to do it. Is that wound up with that fact question that you say the BIA incorrectly resolved? Well, I think that's sort of the slant that the board took on it. What the applicant had argued and what I- That's a spin of the government, at least. That's correct. But what the- Destroyed that. Right. What the applicant argued and proved and the IJ found was that private actors, because of the deeply entrenched social stigma against people with mental illness, that stigma would come to bear on the applicant here in the form of physical violence. So stonings, physical assaults, murder, rape, in addition to sort of lower level, what I would call discrimination. The issue about whether or not the government is willing and able is, is the government of Liberia in a position to prevent that kind of abuse from happening to this applicant? The judge never ruled on that issue. The board never ruled on that issue or looked at it very seriously. In fact, the board says in its decision that the applicant hasn't even alleged that the government of Liberia would not be able to protect the applicant, which just is not true. I read the affidavit and, of course, Dr. Doe- And he also testified consistent with that and there's also documentary evidence in the records as well. Is that issue subsumed under the broader issue which the government puts forward, that this country is broke, they only treat basic medical care, they don't treat people that are medically, have medical problems? No, I don't- Mental problems. Respectfully, I know, Your Honor. The issue is can they- my argument isn't the government of Liberia is going to want to hurt my client for some reason. The issue is are they in a position to protect him from private actors? The answer to that, according to the expert and according to the documentary evidence, is no. Are they in a position is an economic scarcity argument, isn't it? But my argument is it doesn't matter. It doesn't matter why they can't prevent it. I'm not saying the government is persecuting him. I'm saying they can't protect him. Whatever the reason, because they're too poor, because the police force is ineffectual, whatever the reason, they can't protect him. Well, if that's your position, is there any precedent in this circuit to support economic scarcity as a basis for determining that persecution has occurred? Well, it's not so much- I just want to clarify, Your Honor. I'm not saying that my client is going to be persecuted because he can't get medical treatment or because the government is not going to step in and help care for him. My argument is private actors are going to physically assault him or kill him. And then in terms of the willing and able analysis focuses on whether the government of Liberia is able to protect him, given the obvious social strife and desperate- Where was there anything in the Dolo evidence that suggests some measure of probability, whatever it is, some measure of probability that the horribles that Dolo contemplates would be visited upon Mr. Masakoi if he were returned to Liberia? Well, Your Honor, I don't think he ever said, you know, in my opinion there's a 13% chance that this would happen. He presented evidence of what was likely to happen to the applicant in terms of availability of medication, what would likely- the result of that would be for my client in terms of him decompensating and acting out, you know, behaviorally, and what the social stigma associated with mental illness is in Liberia. The immigration- All right, so those are just- that's country conditions testimony, isn't it? No, Your Honor, it's the opinion of an expert who- On the country conditions. On the country conditions and with an opinion about how the social stigma- what the social outlook on people with a mental illness is in Liberia. Let me just see if I have your argument in perspective here. Just backwatering on to the issue of the government's financial situation. As I understood your brief, which I think is a little bit different than I probably heard you hear, if I'm hearing you correctly, your position in your briefing is that the government, true, does not prioritize its medical treatment for basic needs rather than for more ecstatic, esoteric things like mental problems. But there is no- that has nothing to do with the government's law enforcement, which they are adequately staffed for law enforcement, and that they do not- they can enforce the law so as not to prevent people who are dealing in witchcraft and so forth from taking advantage of people that appear to be abnormal. No, Your Honor, I would say that my position, at least as I tried to make it in the brief, was that the government of Liberia, both the sort of the security apparatus and the police and whatever other security forces there are, really are just too weak and ineffectual, and there just really isn't any governmental control of general crime, and that they would not- I'm sorry, go ahead. So your position is that the government's economics is such that they- not that they're unwilling, they're unable- Correct. So you come under the unable prong of unwilling and unable. But you're saying the government's unable to protect these people who are pounced upon, you say, appear weird to the people that are in witchcraft and so forth, and that's the prong that you're saying. That's correct, Your Honor. Okay, I gotcha. I think my time's up. No, I have nothing further. Thank you. All right, thank you. We'll hear you on rebuttal. Good morning, Your Honors. Jeffrey L. Mencken, United States Department of Justice for the Attorney General. May it please the Court. I don't really have much to add to what we have put in our brief regarding the JFF issue. I would defer to or rely upon what we've already briefed. As far as the position that general country conditions can equate to an inaction on the part of the government, I think that's fatal to the defense case for the reason that the conditions that are described, that the security apparatus is unable to protect basically anybody. No, not anybody. His position is that whatever security is there, insofar as mentally deficient people are concerned, that the government is unable to protect them because law enforcement officers will not protect them because they're afraid that the population would look askance at them because there's an element in the country that thinks of witchcraft and thinks these people are possessed and not sick. And so whatever resources they have, law enforcement people will not protect these people that are set upon by people that think that they're wicked, vicious people. So his position is he's trying to come in for asylum under the unable to protect prong, as he articulated. Yes. And I read the evidence and testimony a bit broader than that, that conditions are such that the security apparatus in the country is not really beneficial to anyone, in which case the entire population is in the same boat and there's no persecution because of any particular social characteristic. But I think the board did address the salient point, and that is that there are no resources for health care or health care resources need to be prioritized and there's nothing left for mental illness. And the board did specifically say that that was not sufficient to amount to persecution. And I've heard no challenge to that. Well, the challenge is that he's not dealing with getting care for his mental defects. His position is he has a mental problem, and he's not saying that the government won't treat him because they have no money to treat people that are mentally deficient. He's being set upon by members of the population that think he's wicked and vicious and possessed by an evil devil, and that the government doesn't have the money. It's unable to protect him because it's without funds. Why does that qualify under the unable to protect? Well, I think that feeds back into the finding by the board that the chain of events is just too speculative. It's a quantum of evidence finding, really. Which is a pure legal determination. Legal or even the board in the V.K. decision, which we submitted, hints that it may be a judgment decision. But either way. I'm saying with respect to what would be our standard of review, quantum of evidence, sufficiency of the evidence becomes one that is subject to our plenary review because it's the equivalent of a legal determination. Yes, Your Honor. Okay. Well, acknowledge that sufficiency of the evidence is a legal issue. But looking at the doctor's testimony and the affidavit of the petitioner, both say what's speculative about that? They both say that in this country there are people that think that people are mentally deficient or possessed and wicked and the devil has gotten them and that they're to be set upon at will. What's speculative about something? The doctor's testimony is very clear, as I read it, and his affidavit. The chain of events is speculative, Your Honor, because each one depends on the step before it. And where we start is the testimony of Mr. Masakoi that his behavior is controlled, to a large extent, by his medication. The expert never really reviewed the medical records, so there's no testimony on that. He doesn't know what Mr. Masakoi says. The Dolo testimony is not really specific to Mr. Masakoi, is it? No. No, it isn't. So is that a primary failure in the evidence? I think it is. I'm sorry, Your Honor. For purposes of being able to complete this causative chain that you're suggesting. It is because, in large measure, the expert just presumes that anyone with a mental problem who takes medication will suddenly stop taking that medication and as a result will then act out, and then as a result something else might happen, and then as a result something might happen after that. So is that really by implication on the part of the expert an expression of probability of 100 percent? Well, it is because it's not tooled toward the specifics of this case or the facts of this case. Why is that substantial evidence since the testimony is that in Liberia he's not going to get the medicine for his mental defects, and without that medication he's going to go into his usual mental problems? I think that's the assumption that's made, and, again, I've seen the evidence. I don't believe that the testimony says that the medication that Mr. Masakoi is on is not available. There's just a general statement that health care itself is not available. There are other means of getting medication in this world. But I don't even think Dr. Dalo knew what medication Mr. Masakoi was taking. But everything follows from the assumption that a mentally ill person taking medication no longer will take it, and therefore X starts, Z, Y follows from X, Z follows from Y. But you kick out one leg and the chair falls over. And that's what I think the board ultimately found, and that was certainly that they were entitled to do so. How about the affidavit of the petitioner? He says he's not going to be able to get this medication in Liberia. I mean, he says that knowing certain terms. I don't think Mr. Masakoi is in a position to say that categorically. He's not a medical or health care technician, and it's certainly in his interest to say that. And I don't think that somebody saying that they wouldn't get or wouldn't take their medication necessarily betters his position. Well, it's not a question of fact, though. I mean, is that proper for this court to resolve whether or not he's going to get medication that he needs for his mental problem? Is that something that should be the subject of an evidentiary hearing for an IJ? I don't believe so, Your Honor. The evidence is in the record, and the board acted fully within its granted authority in deciding that it did not rise to the level because it was based on a series of conjectures, as it said, and suppositions. So Mr. Masakoi had his opportunity to reduce proof of that. It was his burden to do that. Yes, and it's his burden at every step of the way. So, again, what we have by the BIA is a legal determination, not a factual finding, that that evidence that was adduced was insufficient to rise to the level of persecution. I apologize for stepping on you, Your Honor. But, yes, the record, the evidence such as it is, does not meet the standard, and that's the board's function, and that's what the board did here. Unless there are any other questions, I would yield the remainder of my time. I would just ask that the panel affirm the decision below. I have no further questions. Thank you very much. Thank you, Your Honor. We'll hear Mr. Yerger on rebuttal. It looks like the big hurdle you've got to get over here is whether or not this is too speculative for us to require a fact finder to resolve whether or not he can get the medication he needs to keep him healthy. Well, Your Honor, whether or not he can get medication in Liberia could not be clearer from this record. The expert testified, and there's documentary evidence in the record, that says there are literally no psychiatrists or mental health professionals in Liberia, none. There's not a single psychiatrist in the country. The only way that anyone in Liberia can get... It's my understanding of this country, which is hardly relevant to the situation on the ground in Liberia, but any MD can write a prescription for psychotropic medications, right? So why, unless we have proof to the contrary, would the mere fact that there's no psychiatrist in Liberia be proof that carries the day for you? Well, the record also says that the psychotropic medications that would be prescribed are also not available. There's evidence in this record, is there not? There's not country conditions evidence. In fact, I think it's in the State Department report, but I may be recalling incorrectly, but there's actually some anecdotal evidence of some steps being taken with respect to a clinic and care being offered to patients at a clinic. All that in the record goes to primary care, not to remain in any way to the provision of care for people who have a mental illness. That's just not the focus. Your point, however, was the availability of medication. Right, psychotropic medication. Right, and that's why I'm trying to infer, even from what you're suggesting is or is not in this record, how that is something from which any fact finder would be required to conclude that you just can't get it. Well, you don't have to conclude that, again, and this goes to the burden of proof and why I'm so concerned about the citation of JFF and the imposition of a higher than necessary burden of proof. All he has to prove is that a reasonable person in his position would be concerned about being persecuted because of this chain of events. So if there's a 10% likelihood that he couldn't get his medication, then he's met his burden of proof, and that's what the concern about JFF is, is that JFF says more likely than not, each step in the chain of causation has to be more likely than not. And by citing the JFF, they've unreasonably heightened the burden of proof such that even in this court, now we're talking about he has to prove. Do you really think that the BIA, the same BIA that sent this back because the IJ didn't seem to understand the burden of proof between a cat claim and an asylum claim didn't understand the second time around the proper burden of proof that had to be met? More likely than not? Well, the only thing I can say, Your Honor, is their analysis doesn't say one way or another. And my reading of the evidence, and the immigration judge's reading of the evidence, was that there was a reasonable likelihood of persecution based on these facts. In the absence of a statement explicitly stating the applicable burden, do you really think that this court on review should be concluding that the very same BIA that sent this back because the IJ didn't apply the proper burden of proof, that we ought to conclude that the BIA here didn't know the proper burden of proof? Well, what I would say, Your Honor, is that right now we don't know what they were thinking. And what I would suggest is that maybe a remand would be appropriate. We know what they were thinking the first time around, which was that the IJ blew it in terms of what the burden of proof was, right? Well, that's certainly true, Your Honor. But, I mean, respectfully, I can't know what the Board of Immigration would do. And the BIA was right that first time, and the IJ was wrong. Do you agree? I do, yes. I think for argument purposes, why don't you just assume that we know your position on the heightened burden of proof. Assume for the purpose of your argument that there wasn't a heightened burden. I think we just want to hear you at this point of the argument as to whether or not it's speculative as to whether or not he can receive this medication in Liberia or whether it comports with JFA's prong of too speculative. Your Honor, I do not think on an asylum grant that the immigration judge is filing for too speculative. It's necessarily the case that any asylum application based on a future fear of persecution, the adjudicator is going to have to make reasoned judgments about what's likely to happen in the future. And just because the immigration did that by necessity here doesn't mean that those findings were speculative in any way they weren't. They're fully supported by the record. I mean, to the extent that any medications are available in Liberia, they're only available, especially mental health medications, are only available to people who are wealthy. So even in Your Honor's point you made about primary health care physicians dispensing medications, the expert without a doubt testified that only the wealthy can afford those medications. My client is absolutely destitute. He has no one in Liberia. Okay, but that's a completely different point from whether or not, as a matter of fact, there are psychiatrists on the ground in Liberia. That's my only point. You're shifting ground now from one point to, again, economic scarcity and economic advances. But, Your Honor, I mean, perspectively that each one of these points I'm making, both are germane to the question of whether or not my client would be able to access medical treatment. Would you have preferred if the IJ, Judge Owens, had not gone into the scenario at the airport? I would, Your Honor. I would have, yes. I think that, at least without explicitly finding it, that that sort of robbery and those things would have happened, specifically on account of mental illness. It made it sound more like it was just sort of general crime there. That was definitely not the focus of this application. Or made it more speculative. Well, I mean, what he was doing, he was relying on the testimony of the expert. That's the scenario that the expert said would happen. He specifically said that scenario. The IJ credited the expert's testimony. And, you know, that's why he said that. Thank you very much. Thank you, Your Honor. We thank you very much, counsel, for your assistance in these arguments. We will take the matter under advisement. We'll call the next matter of Mabu versus Mabu.